So each side has 20 minutes, and just for just a quick question, it's just one side's arguing on each side, right? We're not, no one's splitting time. Okay. Thank you. All right. Go ahead. Proceed. Good morning, Your Honors. May it please the Court. Caleb Trotter for Appellant B.B. I'll keep an eye on the clock, but I'll try to reserve five minutes for rebuttal. Okay. Thank you. This case is about a first grader's innocent drawing given to a classmate in an act of friendship and kindness. A full-size color image of the picture is on page 117 of the supplemental excerpts of record. B.B. made this drawing when she was in first grade after being introduced to the concept of Black Lives Matter by her teacher and be made to feel bad for a classmate because of her race. Despite everyone, B.B., her classmates' parents, and even Principal Becerra himself agreeing that B.B. was only trying to be nice to her classmate with this drawing, Becerra took it upon himself to punish her for it. She was compelled to apologize. She was prohibited from giving any future drawings to her classmates, and she was made to sit out of recess for two weeks, forced to sit on the sidelines and watch her classmates play without her. Well, so, but just in the factual part of this here, it's my understanding that, and I don't know exactly who said it, but there's all inferences at a summary judgment stage or whatever, that the drawing, it was said that she was told the drawing was racist and inappropriate. Correct, Your Honor. That's part of your facts that you get to assume, correct? Exactly. So, tell me about, I noticed in 2024, there's a law that says you can't have kids sit out for recess, basically, unless there's some imminent threat or whatever. What was the status of recess back then? I'm not exactly sure of the answer to Your Honor's question, but I know that in 2021, in the events of this case, the children were going outside for recess. Well, I know they were taking recess, but this law in 2024 says you can't punish a kid and take away their recess unless you can, it's a very high standard of imminent threat and all of that. So clearly, they probably could not meet that standard by that 2024, but I'm wondering what the school policy at the time was, if you took away recess from a kid, is that anywhere in the record? I think what we have in the record is on page three of our further excerpts of record, which is the school's policy on student speech, including which circumstances the school may punish students for their speech. And I think plainly on this record, Principal Becerra violated that policy. The policy cites Tinker, as well as many other established cases on school speech, setting forth very strict guidelines for when students can be punished. And that's going to be an important theme throughout this case, is the difference between preventing speech that may be disruptive or interferes with the rights of others and punishing speech. Let me just tell you, this case is incredibly troubling to me. We have facts in this case about a six-year-old being deposed and the sort of heightened level of animosity over something that is a drawing. There's all sorts of things about this case that are incredibly troubling to me and sad. But the reality is that the law that we are going to be deciding in this case is going to have impact down the road. And this might be a case where the quintessential saying, bad facts make bad law, might come into play. And I really sort of want to test with you what the limits of your broad interpretation of Tinker might result in down the road if we sort of accept that, you know, Tinker massively limits the ability of elementary schools to be able to have some level of, you know, to restrict some level of speech. So I'm going to ask you a hypothetical, and I'd like to know how you would answer this question. So if an elementary school teacher was facilitating a lesson about dinosaurs, let's say, a kindergarten teacher, a first grade teacher, and they said, I want the class to draw dinosaurs, and instead a student decided to draw a bird or a dog or something that's clearly not a dinosaur. And the teacher were to say, you know, that's not the lesson. You can't draw that. We're doing a lesson on dinosaurs. But the student drew something that was clearly outside what the lesson was requiring. Would that student be able to sue the school, alleging that the teacher violated her First Well, they may be able to sue, but I think that student would clearly lose under the Supreme Court's Hazelwood v. Kohlmeier line. That's the line of cases that deal with school-sponsored speech, school curriculum. That's a much higher bar, significant deference to the school to determine what the curriculum would be. I'm not sure I'm really understanding what the distinction here is. Are you suggesting that here in this particular case, the speech was not related to the fine line you were supposed to draw, is that if it occurred outside of a clear lesson that was being taught or that was part of the curriculum somehow, now the curtailing of the speech is impermissible, whereas if a teacher is conducting a lesson, then there is broader protection for curtailing speech? What we're contending is, and the deposition testimony in the record of this case bears this out, is that Beebe testifies that there was a book that was taught to her class, read to her class, introduced the students to Black Lives Matter, All Lives Matter. Her drawing was done in response to that material. So this material was introduced by the teacher to the students itself. So the drawing was responding to that, and that would be completely permissible in line with responding to the school curriculum. So I think that would be, this case is very different from Your Honor's dinosaur hypothetical where the material was completely outside and different from what was proposed. So you're acknowledging and you agree that there are certain things that first graders can say or draw that are not protected under the First Amendment? Clearly yes, and even under Tinker, but the standard for the school under Tinker is to put forward evidence that to prohibit speech, there must be evidence that it would be substantially disruptive or interfere with others, and then same for punishment. So while yes, objectively schools can, it's not an all or nothing scenario here, but the school has a burden. And so your view is that it's possible for the defendants in this case to still be able to put forward that case, but you're saying because we're on summary judgment, when we view the facts in a light, most colorable or favorable to your position, we have to allow that test to be sorted out post-summary judgment? Precisely, Your Honor, and I appreciate the question. I know both parties spent a lot of space and ink on the intricacies of the First Amendment arguments here. I think we do have a couple, I mean, lack for a better phrase, easy way out for this court to resolve the appeal in B.B.'s favor. Yeah, I think part of what would have to, from the standpoint, do we have to decide that six-year-olds have First Amendment rights? Yes, we do at least have to decide that much. So that, there's a lot of ink on the fact that, clearly, I think that you do have the inferences that there were lessons, this was response, and are the parties, I understood that the, is the other side agrees that this drawing is speech? Is there a dispute between the parties on that? I don't think so, because they have acknowledged that tinker is the appropriate standard here, which of course governs pure speech. Well, so there's a lot of discussion about the fact that this child doesn't really, well, clearly there's an inference that the child is responding to something that the school has introduced. Now, if the child had said, for example, after hearing this, and I heard of someone that their child did this in class and said, well, does my life matter? Would that be speech on a part of a student? In the discussion of, if you introduce that subject in class, and then one of the students says, well, does my life matter? And the teacher found that offensive, is that speech at, it seems responsive to what they're discussing, but does your age have, it's like, if you don't understand why it's upsetting someone to say that, but that's what your feeling is, would we, are we saying, I think Judge Josiah was saying, well, how broadly do we go on this? But basically, if someone's six, if they do something in response to a discussion that's been had, are we saying, not all six-year-olds, we're not saying every six-year-old, every six-year-old has a First Amendment right, but you're saying in this situation, that child was making a statement of how she felt and what she had heard? Yes, I think that would clearly be speech, but that's not the end of the court's inquiry. The inquiry would be- Yeah, well, I'm a principal's daughter, okay? And I tried to stay out of the principal's office, which I did successfully my entire life. But that being said, schools obviously are faced with a lot of situations. It doesn't seem to me that, and then in this situation, we know that the parent of the friend contacted the school and said something to the effect of, I found this in my daughter's backpack, I don't want my daughter being singled out for race. And so it would seem, if I were the principal, that I would need to at least respond to that parent. Now, we could look at this and say, well, that the response is wrong, but how does that fit into this whole analysis here? Obviously, the mother of Bebe wasn't contacted. They didn't put both parents in the office and say, hey, we had this little situation in class and how do we want to handle it? But I think the principal, anytime a parent complains to you or contacts you, you kind of have to have a little response. So what was wrong with what the principal did here? There was absolutely nothing wrong with the principal investigating to find out what happened, what was the story behind this drawing. The problem arised when he punished Bebe solely for this speech that everyone, including Principal Becerra himself, has acknowledged was innocent. So that's where the line has to be drawn, is that the punishment for the speech and Well, the speech being innocent doesn't equate to the speech being protected, right? That we're saying it's speech, but it seems like a lot of people are talking about, well, she doesn't even know what she's talking about. How can we give this child First Amendment protection? Because she just, she's like drawing pictures, you know? But I think you could make an argument that she's responding to what they said and that was at her age appropriate level saying, well, this is what I'm hearing you say. And the argument could be made that if adults had this discussion about Black Lives Matter versus any lives matter or all lives matter, it's kind of a, it is sort of a trigger. Not everyone agrees on this as adults, what exactly that means. So if it were t-shirts with older students, the school might be able to say, that subject, we don't really want to, we don't want to wear t-shirts and bring up that subject. Could the principal then say, okay, no, you can't have t-shirts with my life matters or any lives matter or all lives matter and black lives matter because we're, we know that might cause problems. So it depends. It's of course a fact-based case-by-case inquiry. And to step back, there are two steps here. Step one is, is there speech at issue here? I think everyone has agreed that there is at least speech. We of course dispute the district court's views on age. But I think everyone can agree that there is speech here. But that's not the end of it. What do you mean by that you dispute the district court's statements about age? Are you saying that age should not be a factor when we're considering the breadth and scope of Tinker's application here? Absolutely not, Your Honor. Age is certainly relevant to the analysis of- In fact, I mean, a number of our other circuits in this country have sort of held kind of the opposite of what you're arguing here, which is that to the extent that Tinker applies, any protection is incredibly narrow. Because at a young age, there is a greater, you know, a policy supporting regulation of speech in schools. You'd agree with that, right? I do agree with that. And we're not disputing that age is a relevant factor. It of course is. But it's relevant in determining whether the speech would be disruptive or interfere with the rights of others. Obviously, that answer is going to be different in a first grade versus a twelfth grade classroom. But what we dispute with the district court was, in our reading, the district court essentially used age as a dispositive factor and also failed to construe the record in the light most favorable to Beebe in doing so. So you're contesting sort of like a bright line rule that if there is a certain, if we're talking about first graders, then all regulation is permissible on speech. That's what you're saying is not okay. You're still saying we need to go through the tinker. There still needs to be evidentiary adjudication with respect to the tinker factors. Exactly. And our two best cases are, of course, the Supreme Court's West Virginia v. Barnett case. There were eight and nine-year-olds involved there. That was the Pledge of Allegiance class. Their right to not engage in the Pledge of Allegiance was protected. And even this court's decision, the CR v. Eugene School District, that involves some sixth graders, so first to sixth grade. So it's not true that only high schoolers have a right to speech. But granted, it is a factor of age. Counsel, what remedy is your client seeking? So at this stage, we are only on appeal of defendant's motion for summary judgment. So our remedy is just to vacate that grant of summary judgment as premature and remand to the district court for trial. Okay, big picture then. Let's assume we agree with your client, we remand. What remedy is your client seeking? These kids are now, what, fourth, fifth grade? Fifth grade.  The state law claims for emotional distress are gone. There's no record of discipline affecting BB's future. There's no challenge to the school policy left. There's no claim for declaratory or injunctive relief. So what are you asking for the courts to grant? I know what you're asking us to grant. I just want to know big picture. So what's left in the complaint is claim for damages. And of course, that would have to be determined after a trial. And have you put any evidence of damages forth yet? I think that the most relevant evidence would be the punishment of the speech on the issues that are still live on appeal. I'm just curious how you even separate damages from the initial incident, from the potential damages and trauma from having six-year-olds undergo the kind of litigation that they've been subject to. I appreciate Your Honor's concern. And I likewise don't have a good answer to that question. You know, we mentioned earlier some struggles that the court might have with where to draw the lines with big picture with this case. And as I mentioned, we're not asking this court to necessarily resolve whether Beebe's First Amendment rights were violated in the big picture of this case. That, of course, needs to go back for trial for that determination. What we're simply asking is that granting summary judgment was premature because inferences were not properly construed in Beebe's favor in the district court. And based on case law from this court, from the Supreme Court, the district court could not have granted summary judgment. So is there a reason to publish on that? There's a lot of amicus briefs, obviously, because it's the, that obviously, basically, the district court just couldn't conceive of the fact that someone at that age, even giving you all those inferences, that there was no there there. So if this court were to say, well, okay, you give all inferences, there's there there to go to trial. Is that something that needs to be published? A published decision, I think, is necessary to clarify that under Supreme Court and this court's precedent, even students as young as first grade do have free speech rights. Would you feel the same way? Would you answer this question the same way if we were to adopt a bright line rule that children of a certain age, consistent with what the district court held here, do not enjoy the same protections? Well, such a decision would certainly be precedential. I just don't think that this court could so say because of the Supreme Court's decision in Barnett. Well, you would say it would be wrong. We could say it.  But there was one other question before I have you sit down that, um, do we need to look at the district court didn't look at qualified immunity, right? Correct. Because the district court just said, granted summary judgment said, you got nothing. You got nothing here. Do we need do we need to look at that? You don't have to. Of course, you could remand that. But if this court does decide to get into it, I think there are three aspects of free speech rights that are clearly established in this case. I'm happy to address them if you would like, but I do think it would be appropriate because the district court didn't touch on it at all for that to be considered there in the first instance. Okay. Well, we've had a number of questions of you, so I'll give you two minutes on rebuttal. Thank you. Good morning. Good morning.  Thank you, Your Honors. May it please the court. Courtney Hilton on behalf of Appellees. Your Honor, to answer one of your initial questions, we agree First Amendment, first grade students enjoy First Amendment rights. That's not a up for dispute. That was not what Judge Carter held in the district court. There was no indication of a bright line rule that first grade students do not enjoy First Amendment rights. But the issue is, as explained in Tinker, those rights are not absolute. It's a very fact specific analysis. And that's what we have here. So you agree that if you're going to talk to six-year-olds about issues that can be racially charged, I mean, if you want to talk about Black Lives Matter with adults, intermediate school or whatever, they're going to be discussions. You know, people are going to talk about it because not everyone agrees to what the exact meaning is of that, whether it's historical or what, you know, this, it's going to. So if you do that in first grade, isn't it to be, I mean, if all inferences are that her drawing was in response to what you introduced in the curriculum with six-year-olds, right? Partially, Your Honor. Well, she didn't draw that in. She drew it in Black History Month when you were telling Martin Luther King stories and Black Lives Matter stories, right? So the record below shows that, or evidence is that Black Lives Matter was what was taught. All lives or all lives matter was not within the curriculum, not taught. Beebe even testified that that was something that wasn't taught. She equated all lives with, or any life with all lives matter, but that was not something that was taught. There's also nothing in the record showing that MC was taught that. But you introduced the subject matter. Her drawing happened when you talked about it in Black Lives Matter in class, right? That is the record below, Your Honor. Okay. And you agree that the drawing is speech? Yes. Okay. Where you disagree is that Tinker gave the print, what you did was appropriate.  Where we disagree is that providing that drawing to MC invaded MC's rights to be let alone. If Beebe had worn a shirt with that, it's a passive... But there was no disruption. Is there any element of disruption in the record, honestly? No, Your Honor. That obviously is our weakest argument. We didn't brief it significantly. I guess I would only... What people are going to say in response to what you have to say is not that, like I said, as a principal's daughter, I think the principal had to have a parent calls and is concerned about something. But the record also shows that he chose not to involve the other parent. Now, that might've been perfectly appropriate, but it is something that they could use as an inference in terms of that the principal really didn't want to discuss this fully. And then we know the inferences they're entitled to is this child was told not to draw, was told that her drawing was racist and inappropriate. We don't know exactly who did, but we know that's what they get inferences and that she was benched for two weeks. In what world is it appropriate? And then everyone's arguing, this is such an innocent child, she doesn't know what she's doing. Then why is she punished? Well, Your Honor, schools are in the business of educating students. And when a drawing is provided to another student that upsets a parent, MC's mother, who is speaking on behalf of... Not the child, not the child. Correct. But if that was the bar, any student who doesn't understand what they're receiving, the parent would have no... I don't think the court is suggesting that a parent doesn't act as the voice for that child. Let me ask you this because you started by saying that you don't dispute that a first grader has some level of First Amendment protection. Correct. And that the drawing is speech and that these are fact-specific inquiries that must occur to determine whether or not the protection is sufficient under the Tinker Standard. So much of what's happened since you made that statement when you first stood up is a discussion about the facts. What has been alleged versus what is clear from the record, the disputes that exist with respect to whether or not there was actually MC's right to be secure and left alone, whether there was disruption, whether, frankly, there was even punishment. I mean, I think that there are disputes over whether or not there was punishment. So why wouldn't this be exactly the kind of case that is not appropriate for judgment at the summary judgment stage? And that should proceed to at least some level of fact-finding over these genuine issues of material fact. Because the courts have already determined that significant deference is given to principals in the running of their schools. This speech invaded MC's right to be let alone. She was provided that drawing because of her race. But isn't that a fact question, whether or not it affected her right to be let alone or to be secure? I'm not understanding how we can... They've alleged otherwise. So we have a genuine issue of fact. Well, I believe there is no dispute that it was provided to MC because of her race. Well, but I think some parents would look at this as... And I think, admittedly, we have the parent of... And the parent of the African-American child said, I don't want to really make a big deal of it. I just don't. But the school, on the other hand, someone thought, well, you know, I know better than anyone else. And I need to tell this child that they've made a racist and inappropriate statement in their drawing. That's not tinker. That's someone at a school and saying, well, I have the answer for this here. And I'm going to tell you, your drawing is racist and inappropriate. And why isn't that just over the top? Well, Your Honor, to correct lightly, one of the things that you just said, when MC's mother communicated with Mr. Becerra that this drawing was in existence, she said, I don't want my daughter receiving these types of things. I trust you will deal with this. Now, in deposition, she testified subsequently, I didn't want her punished. I didn't want anything happening. But I trust you're going to deal with this, is what she said. Can you give me an example of a situation where an elementary school would violate the First Amendment by regulating a young student's speech? Well, if, as I mentioned earlier, if MC was wearing a shirt, I'm sorry, BB was wearing a shirt that specifically said Black Lives Matter, it had nothing, it wasn't targeted or directed at anyone, any one student in particular. Well, the 2024 law that I've told you exists now. You could not have benched that child for two weeks with that law because there was not an imminent threat here. You would have been clearly wrong, would you have not? The law was, that law was not in existence. I know it was not. Okay, but if it happened now, and based on that law, could you justify benching a child for two weeks? And I think the definition of benching, she wasn't. But that law talks about recess is important. Kids need recess. And it basically goes to that schools don't get to deny recess to kids. And I got a little bit out of this record that part of the things that were in the discussions is, well, we would have normally documented this if we had taken away her recess. So there was something in existence in a school policy at the time that said, if you're gonna take away recesses, you need to document it. And this isn't documented, right? Correct. And there are other documentations where, you know, little BB apparently might have had a missed a couple of other recesses. There's a lot of people my age that missed a lot of recesses. But apparently at that particular time, it seems that the schools had some sort of policy that if you're gonna take away a child's recess, we recognize that's an extreme type of punishment. If there was discipline imposed in the form of taking away recess, it was documented in a student's file. There is a dispute in the facts as to whether or not recess was actually taken away. There's no supporting facts other than BB's testimony that it occurred. So we are left with the fact that it occurred. That's a factual. But for here, we have to say it occurred. But let me just play the devil's advocate here as if I were on this side here, which I'm not, I'm right here in the middle of both of you. But that being said, I would argue the reason it wasn't documented because whoever did it knew it was wrong. They didn't self-report. So if you assume that it should have been documented if it occurred, then I would make the argument if I were representing BB. Well, the reason it's not documented because the person that did it took it upon themselves. They decided how they were gonna handle it and they didn't wanna leave any fingerprints on it because they knew that when you take recess away. And the record also indicates that BB's mother heard it on the street. She never was notified by the school or never brought into this. Or if it was such of a significant nature of a taking recess away, she wasn't instructed to go sit in the principal's office and not go outside. That's not the record. That's not the evidence. She went to recess. She would sit and read. No one ever checked in with her. No one ever made sure what was going on that she wasn't playing. She was just told that she was gonna have to sit somewhere and read. Well, isn't this why a jury just gets to decide if what you did was okay for this child? But Your Honor, our position is, is even if that occurred, it was not a punishment. It was a regulation of the speech and in response to the speech and in response to BB. But if she had a right to say it in the first place, you can't punish her at all for it, right? If she had a right to say it in the first place and that's what we contend she did not. Let me ask about that, counsel. So what evidence is there about actual or potential disruption of the school's educational goals or of MC's right to be left alone? Well, I think we've conceded that there, realistically, it was not a substantial disruption. But with respect to MC's right to be left alone, the evidence is her mother's communication that she did not want her daughter receiving something because of her race. The record is clear also that BB said she provided the drawing to MC because of her race. So this is different than a number of other cases that involved passive speech. Here we have active speech targeted at one person because of their race. So we've all talked about how these are first graders and taking away a first grader's recess is harsh. I mean, they like to play, they're energetic, they need to let out their stress. So if we take the plaintiff's version as true, the principal, Mr. Becerra, seems to have reacted harshly to BB's drawing, which it seems like everyone's in agreement that it was innocent. BB, at six years old, didn't know what, you know, wasn't targeting MC to tell her, hey, any lives matter, not just black lives. She's six years old, she doesn't know what's going on. So how does that not, how does Mr. Becerra's reaction not overstep the school's obligation? I know the school has the obligation to balance the student's expression with regulating speech, making sure, you know, it's a safe learning environment. But did he not overstep? Your Honor, granted, Mr. Becerra could have handled this differently. I don't think anybody will disagree with that, that he could have handled it differently. The question is, is did he violate her free speech rights? And as my friend on the other side noted in their reply brief on page 21, Mr. Becerra was perfectly within his right to regulate the speech by telling BB not to draw anymore, not to give her drawing to friends. So where's the line? What steps did he take that then caused it to be a violation? Well, that she was told her drawing was racist and inappropriate, and that she had to miss recess for two weeks. He didn't draw the line there. At this stage, he stuck with that. Correct. And those types of discussions, a drawing is racist, a drawing is inappropriate, occur in schools all day long. Missing recess back then, as Your Honor has noted, was something that occurred regularly. It is a way- Well, but conclusionary, you know, as a parent, it's kind of, it's, I would not want my first grader, who had a friend that was African-American and was trying to make her friend feel better, be called by, told that what she did was racist and inappropriate because that's how that teacher would have talked to her kid, as opposed to that, you know, this is, you know, there are people that feel differently about what Black Lives Matters means, or if you tell someone, you know, you're really important to me. You're my friend. I don't want you to feel bad. Then to get, it's sort of like, when you, as an adult, if you call someone a racist, I mean, those are fighting words. The fact that she's only six, does that mean it's any less damaging to get that put on you? Which is essentially what the, whoever conveyed that. And it was, it's alleged that it was Becerra. And Your Honor, that was a teachable moment for Mr. Becerra to have a discussion with- For him to say it was racist and inappropriate when other people might not have reached that same conclusion. Yes. So that's what you argue in front of a jury, that he had that teachable moment. And what the other side's going to say, no, that wasn't a teachable moment. That was someone calling my child racist and inappropriate. And you don't, you don't, you know, you can say, we're not going to draw if, or something along those lines. But to make that categorization and put those proxies on, you know, I mean, I still remember in fourth grade when I got in trouble. You know, to say that kids don't, that they don't have feelings so that things don't bother them. Well, and I think to address Your Honor's concern, a question earlier about, you know, the effect of this and where does it go. In deposition, Bibi, and in the record, Bibi said, she doesn't think about this anymore. She continued to draw. She's moved on. She doesn't think about Becerra. So at least in our case, that statement, that discussion with her was not something that impacted her going forward. Well, it goes to damages. It doesn't go to say that what you did was okay or that someone doesn't get. I, if I was defending the summary judgment, I would be saying the same things that you're saying. And if he's, I'd be saying the same things as he's saying. And I don't really know what a jury would say. I don't think, I don't think either, I don't know if either of you could get nine or 12 people to agree with you. I don't know. I mean, people feel differently about it, but when you grant summary judgment as a judge is what you say is no reasonable juror would find that person in favor of that person. I understood, Your Honor. And I think what we're talking about is the sliding scale of the rights of a principal to regulate the speech of a first grader versus a 12th grader versus a higher level student. We're not dealing with first graders who are engaged in discussions in the marketplace of ideas. First graders are supposed to be learning to tie their shoes. They're supposed to be learning. Maybe then you don't give a Black Lives Matter course to a first grader. Maybe you teach tying shoes. Okay. I guess what I'm saying is you can tell if Mr. Brassera is sitting out there or if Bebe's mother's sitting out there, it's summary judgment is that no reasonable juror would find in favor of you. I don't know that either of you, I can't say that, but if I'm not a reasonable juror and I'm thinking that there are tribal issues that someone should be able to tell their story, that maybe she doesn't have any damages, but maybe someone, I'm going to tell you, there'd be parents that would be just as irate as Bebe's mother that are going to be sitting on your jury. I don't know how that's going to come out, but in my view, and I don't speak for anyone or whatever, but if I'm a reasonable juror, if that's what you're looking at, it's not as slam dunk as the school would like to say from my perspective. Let me ask you about qualified immunity. Yes, and again, Your Honor, yes, we believe qualified immunity should carry the day. This court can consider qualified immunity and we believe that they should. This was not a right that was clearly established. Mr. Becerra, his statements to Bebe and his regulation of the speech in this situation was not something that was clearly established for him to know that he was violating her First Amendment rights. Well, if it happened today, after the law that was passed in 2024, would it be clearly established? The punishment part of the, what is alleged to be the punishment part of it, it could be. Well, it could be. I mean, it says pretty clearly, you can't put children, you can't deny recess unless there's an imminent danger and you've already conceded there wasn't any disruption even. So that would have to be, they'd be on notice of that. So then the question is, is the conduct so obvious to anyone that takes care of our children that you can't punish children for something that's such innocent conduct? Then he's not entitled. You don't have to have a specific case. Now, yes. Then when this occurred, it was not clearly established. So even though we are asking us to find qualified immunity here. Yes. All right, but what if we don't think you have qualified immunity? Do you want us to say that right here? I would prefer you not say that right here.  But if that is something that- Because he's saying that, leave that to the district. Well, and actually qualified immunity, if I understand it correctly, that you could not be entitled to qualified immunity right now. You can still, even though it doesn't make any sense, you can still grant it after a trial too. But it doesn't make any sense because that's sort of you beat the rat, but not the ride. If qualified immunity is supposed to protect you from going to trial. And I do believe, Your Honor, the court is within its right to find qualified immunity now because the court can uphold the lower court's ruling based upon any grounds that were argued in the lower court and qualified immunity was argued. Just about out of time. Do we have any other questions? I have one, actually. I just wanted to clarify something because I wasn't sure if I understood you properly. So first graders have First Amendment speech, correct?  Okay. And then Principal Becerra had a right to punish, I guess, or I don't want to put words in your mouth, but regulate that speech. Is there anything that Principal Becerra did in this exact same situation that in your mind would be too much? Not in this situation. He could do anything. He could expel her. I'm sorry. I'm sorry. I thought you meant under given our facts. No, if he expelled her, if he suspended her, if there was something that crossed the line that would have been in her permanent record that could have impacted her going forward, I think we're in a different, whole different ballgame. So, but if it were today, his punishment would be, it would be clearly established that she could not have been denied recess for two weeks. For her speech, yes. Okay. But what you're saying at that time, what he did was okay. Everything he did was okay. At that time, based upon the information he had in front of him and the state of the law at that time, yes, what he did was correct and accurate and not a violation of her free speech. Okay. Thank you. Thank you. Okay. Excuse me. I'd like to pick up on just that last exchange between my friend and the court and just point this court back to this court's decision in CARP v. Beckin. This court said that punishing students for speech is only permissible if the student has violated some law or school policy. No one has contended that Bibi did either of those. In contrast, Principal Becerra violated the school policy in punishing her for her speech. And that's the policy on page three of our further excerpts of record. The discussion about what MC's parents wanted, what is key in that discussion is that once the parents learned what was actually going on, why the drawing was given, they explicitly told Becerra that they did not want Bibi to be punished. And yet that's what he did. So while, yes, it was appropriate for the principal to find out what was going on, him then taking a step that the parents didn't even want is completely removed from that student's rights to not be infringed. Well, it's evidence, but you don't, if you're the principal, I'm going to defend the principal in the sense that, you know, I've had people come in when I was a judge and they said, don't sentence the person to X amount of prison. I want you, you know, I'm the victim, sentence less. Hey, I'm the one that makes the decision. So just because someone comes to the principal and says, well, I don't want you to do anything. Well, the principal has to do what he or she thinks is correct. Not necessarily, they're not an extension of anyone that comes in and complains. But on the other hand, whatever they do, they're responsible for it. Better comport with the law. I couldn't have said it better myself, Your Honor, that yes, the principal has the independent duty to determine what's appropriate. But as far as this discussion on deference, I take the other side's argument, not as just deference in a way, but that we have to, that the court has to defer, period, to what the principal decided. And that, of course, is not the law. We wouldn't have Tinker. We wouldn't have Barnett if that was the law. And unless this court wants to discuss any qualified immunity any further, I'll go ahead and sit down. We don't appear to. Thank you both for your argument in this case. This matter will stand submitted.
judges: CALLAHAN, DESAI, ALBA